Debra O'CLAIR, Plaintiff,[1]

v.

Frank DUMELLE, III and, Constance G. Dumelle, Defendants.

No. 88 C 8966.

United States District Court, N.D. Illinois, E.D.

Feb. 21, 1990.

---

1. Debra O'Clair is asserting claims on behalf of both herself and her daughter's estate. Therefore, the complaint caption should have been styled with the plaintiff described as "Debra O'Clair, Individually and as Administratrix of the Estate of Beth Ann O'Clair."

Sidney Ezra, Chicago, Ill., for plaintiff.

Stephen E. Sward, Mary G. Broderick, Rooks, Pitts and Poust, Chicago, Ill., for defendants.

## ORDER

NORGLE, District Judge.

Before the court is the motion of defendants', Frank Dumelle, III and Constance G. Dumelle (the "Dumelles"), pursuant to Fed.R.Civ. 56(b) for summary judgment on the five count amended complaint of plaintiff, Debra O'Clair.

Rule 56(c) of the Federal Rules of Civil Procedure provides that a summary judgment "shall be rendered forthwith if the pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A plaintiff cannot rest on mere allegations of a claim without any significant probative evidence which supports his complaint. *Id.; see First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims and defenses." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Accordingly, the nonmoving party is required to go beyond the pleadings, affidavits, depositions, answers to interrogatories and admissions on file to designate specific facts showing a genuine issue for trial. *Id.*

## FACTS

The following facts submitted by the Dumelles are supported by the record and are adopted, with minor revisions, as the undisputed facts in this matter.

During 1987, the Dumelles owned eight to ten acres in a rural area in Marengo, McHenry County, Illinois. Transcript of the Deposition of Robert Nagy ("Nagy" Dep.) p. 7. The Dumelles had a house, barn, stable, chicken coop, riding area, wheat and hay fields and horses. *Id.* Also, on this land, adjacent to their house, was an above-ground swimming pool.

In September, 1987, Debra O'Clair, and her three-year old daughter, Beth O'Clair, both residents of Massachusetts, visited the Dumelles for one day. Transcript of the deposition of Debra O'Clair, Exhibit C to defendants' motion for summary judgment p. 18–19. During that visit, Debra O'Clair became aware that the Dumelles had an above the ground swimming pool in their back yard, which was connected to the living room of the house by a deck. Exhibit C, p. 21; Nagy Dep., p. 9.

Sometime after the September, 1987 visit, Debra O'Clair was called in Massachusetts from the Dumelles' home by her friend, Rob Nagy, who was visiting the Dumelles, and invited to visit the Dumelles again. Exhibit C, p. 26–27. Debra O'Clair told the Dumelles that she would come to visit them for a second time. Exhibit C, p. 27–28. Debra O'Clair and Beth arrived at the Dumelles, with Rob Nagy, sometime during October, 1987. Exhibit C, p. 23. It was Debra O'Clair's intention that they stay with the Dumelles for a couple of weeks, Exhibit C, p. 35, and they had been at the Dumelles for about two weeks at the time of the incident. Exhibit C, p. 48.

Debra O'Clair was aware that the swimming pool was present when she returned to the Dumelle home and that the swimming pool had water in it. Exhibit C, p. 38. Debra O'Clair knew that Beth had played near the swimming pool and had told her not to go near it. Once, when she saw Beth get a bucket and attempt to get water out of the pool with it, Debra ran and grabbed her. Exhibit C, p. 40–41. Debra O'Clair was also aware that Beth had toys in the Dumelles' backyard, where the swimming pool was located. Exhibit C, p. 54. Debra described the water in the pool as "gross," "disgusting" and "dirty." Exhibit C, p. 56.

The Dumelles were planning to get up early and leave their home to pick up some horses on the morning of November 1, 1987. Debra O'Clair knew that the Dumelles would be leaving their home "really early." Exhibit C, p. 58. When Debra O'Clair woke up on November 1, 1987, she went into the living room and spoke with the Dumelles. The Dumelles told Debra O'Clair that they were leaving the premises to pick up some horses. Exhibit C, p. 61. Debra O'Clair understood that she, as Beth's mother, was responsible for looking after Beth. Exhibit C, p. 102. At that time, Beth was on the floor of the living room in her pajamas watching television and coloring. Exhibit C, p. 60, 62–63. It was rainy and cold, about 40 degrees, outside. Nagy Dep., p. 22.

Debra O'Clair was aware that the sliding glass door in the living room, which lead to the deck connecting the house to the pool, had been kept unlocked on a regular basis by the Dumelles. Exhibit C, p. 76. Debra O'Clair was also aware that Beth was capable of opening the unlocked sliding glass door by herself. Exhibit C, p. 82. Debra O'Clair did not ask the Dumelles to lock the sliding glass door when they left their home on the morning of November 1, 1987, Exhibit C, p. 101, and she did not check the door to seek if it was locked or unlocked. Exhibit C, p. 83.

Shortly, after the Dumelles left the premises, Debra O'Clair went back to a bedroom to speak with Rob Nagy for a period of about 15 to 20 minutes. Beth sat in the living room in front of the television, Exhibit C, p. 62–63, next to the unlocked sliding glass door which led to the pool. Exhibit C, p. 95. Debra O'Clair could not see Beth from her location in the bedroom. Exhibit C, p. 63. Debra O'Clair checked on Beth four or five times in a 15 to 20 minute period. Exhibit C, p. 63.

After approximately 20 minutes, Debra O'Clair noticed that Beth was missing, and searched for her. Debra O'Clair did not look into the pool for Beth when she realized that her daughter was missing. She looked for Beth in the house and in the surrounding neighborhood. Exhibit C, p. 65, 70. Beth was found by Rob Nagy in the swimming pool. Exhibit C, p. 64–69, 74; Nagy Dep., p. 27. Debra O'Clair and Rob Nagy took Beth to Memorial Hospital. Exhibit C, p. 85–86. Beth was transferred to Rockford Hospital later in the day, where she was pronounced dead. Exhibit C, p. 88, 90.

On October 21, 1988, Debra O'Clair filed a complaint against the Dumelles alleging that their negligence resulted in the drowning death of Beth O'Clair. Specifically, she alleged that the Dumelles disregarded their duty to Beth by (1) failing to keep the sliding door in the family room, which lead to pool, locked, (2) failing to drain the pool properly, (3) failing to cover the pool, (4) failing to fence the pool, (5) failing to replace the pool ladder, and (6) failing to

remove toys from the pool. The Dumelles answered on January 6, 1989, denying all allegations of negligence, and now move for summary judgment based on the absence of any duty owing from themselves to Beth O'Clair.

## DISCUSSION

Beth O'Clair's death is truly a tragedy. Emotions are stirred by the story of a young child deprived of the opportunity to enjoy the promises of life. Sympathy for her mother is evoked. A desire may arise to compensate for the death of a child and the loss of a daughter in the only way the law can—monetarily. Yet, emotion cannot prevail. Compassion for the mother on the loss of her child must yield to justice for the faultless accused. That one has sustained a loss is not sufficient to require a third party to compensate for that loss. As stated by the Illinois Supreme Court:

> It is always unfortunate when a child gets injured ... [or killed] ... while playing, but a person who is merely in possession and control of the property cannot be required to indemnify against every possibility of injury thereon. The responsibility for a child's safety lies primarily with its parents, whose duty it is to see that his behavior does not involve danger to himself. Others can be held responsible for injuries only if they are at fault under some recognized theory of liability.

*Driscoll v. C. Rasmussen Corp.*, 35 Ill.2d 74, 219 N.E.2d 483, 486 (1966);[2] *see also Gille v. Winnebago Housing Authority,* 44 Ill.2d 419, 255 N.E.2d 904, 907–08 (1970).

Any legal obligation to compensate under these circumstances can only follow from a determination that the Dumelles were negligent, not from the mere fact that the loss—Beth's death—occurred on the Dumelle's property. Negligent behavior has occurred where defendant breached a duty owing to plaintiff proximately causing the injuries sought to be compensated. *Beal v. Kuptchian,* 164 Ill.App.3d 191, 517 N.E.2d 712, 713 (5th Dist.1987); *Petrik v. Monarch Printing Corp.,* 150 Ill.App.3d 248, 501 N.E.2d 1312, 1316 (1st Dist.1986).

■ The first element which must be established is, of course, the existence of a duty owing from defendant to plaintiff. If no duty existed, it is axiomatic that no recovery can occur. *Keller By Keller v. Mols,* 129 Ill.App.3d 208, 84 Ill.Dec. 411, 413, 472 N.E.2d 161, 163 (1st Dist.1984); *Beal,* 517 N.E.2d at 714. "Whether under the facts of a case such a relationship exists between the parties as to require that a legal obligation be imposed upon one for the benefit of another is a question of law to be determined by the court." *Keller,* 84 Ill.Dec. at 413, 472 N.E.2d at 163; *see also Mieher v. Brown,* 54 Ill.2d 539, 541, 301 N.E.2d 307, 308 (1973); *Beal,* 517 N.E.2d at 713.

■ Although this concerns the potential liability of an owner of land for injuries sustained by a child as a result of an allegedly dangerous condition, Illinois has long since abandoned the concept of attractive nuisance—determining that the liability of owners and occupiers of land would be evaluated under the principles of ordinary negligence. *See Corcoran v. Village of Libertyville,* 73 Ill.2d 316, 22 Ill.Dec. 701, 383 N.E.2d 177 (1978); *Kahn v. James Burton Co.,* 5 Ill.2d 614, 126 N.E.2d 836 (1955). An owner or occupier of premises owes entrants onto the premises a duty of "reasonable care under the circumstances regarding the state of the premises or acts done or omitted on them." Ill.Rev.Stat. ch. 80, ¶ 302. "As a general rule, a landowner-occupier has no duty to take special precautions to insure the safety of children." *Corcoran,* 22 Ill.Dec. at 703, 383 N.E.2d at 179; *Kirby v. Macon Public School Dist. No. 5,* 169 Ill.App.3d 416, 119 Ill.Dec. 887, 890, 523 N.E.2d 643, 646 (1988). Still, under *Kahn* and its progeny, such a special duty may exist where the landowner-occupier knows or should know that children frequent the premises and a child is injured by a dangerous condition on the premises.

---

**2.** As both the allegedly negligent conduct occurred and the injuries were sustained in Illinois, Illinois tort law governs the claims asserted in this diversity action. *See R & L Grain Co. v. Chicago Eastern Corp.,* 531 F.Supp. 201, 204 (N.D.Ill.1981).

Where these two factors are present, injury to children is foreseeable. Yet, where children can appreciate the risk caused by the condition, it is not dangerous and no special duty arises. *Corcoran,* 22 Ill.Dec. at 704, 383 N.E.2d at 180; *Alop By Alop v. Edgewood Valley Community Ass'n,* 154 Ill.App.3d 482, 107 Ill.Dec. 355, 357, 507 N.E.2d 19, 21 (1st Dist.1987); *Friedman v. Park District of Highland Park,* 151 Ill. App.3d 374, 104 Ill.Dec. 329, 502 N.E.2d 826, 834 (2nd Dist.1986); *Keller,* 84 Ill.Dec. at 414, 472 N.E.2d at 164.[3]

■ In determining whether to impose a duty, the court must consider the foreseeability and likelihood of the accident plus the costs and consequences of requiring the defendant to guard against the injury. *Beal,* 517 N.E.2d at 714. "The touchstone of liability is ... predicated upon a test of foreseeability of harm." *Corcoran,* 22 Ill. Dec. at 704, 383 N.E.2d at 180; *Kirby v. Macon Public School Dist. No. 5,* 169 Ill. App.3d 416, 119 Ill.Dec. 887, 890, 523 N.E.2d 643, 646 (4th Dist.1988) *(citing Kahn,* 5 Ill.2d 614, 126 N.E.2d 836). The mere occurrence of an accident does not make that accident foreseeable. A contrary rule would make the landowner an insurer of another's safety while on his premises. *Beal,* 517 N.E.2d at 714. The creation of a legal duty requires more than a mere possibility of an occurrence. *Dunaway v. Ashland Oil, Inc.,* 172 Ill.App.3d 712, 122 Ill.Dec. 557, 560, 526 N.E.2d 950, 953 (5th Dist.1988) *(citing Cunis v. Brennan,* 56 Ill.2d 372, 376, 308 N.E.2d 617, 619 (1974)). The event causing the harm must have been reasonably foreseeable. "To establish reasonable foreseeability, plaintiffs must show that defendants could have foreseen that the event was possible; they must show the occurrence was 'objectively reasonable to expect.'" *Dunaway,* 122 Ill. Dec. at 560, 526 N.E.2d at 953. The focus must be on what was apparent to the defendants at the time of their alleged negligent conduct. *Beal,* 517 N.E.2d at 714. Hindsight makes every occurrence foreseeable. *Zimmerman v. Netemeyer,* 122 Ill. App.3d 1042, 78 Ill.Dec. 383, 387, 462 N.E.2d 502, 506 (5th Dist.1984).

■ There are numerous reported decisions which give the court guidance in conducting the foreseeability analysis. While a review of them is in order, what may be gleaned from these authorities is obviously affected by the special circumstances of this case.[4] This is not a case where a child or group of children were permitted to play unattended or unsupervised upon .the defendants' property or did so with defendants' knowledge. *See Dunaway,* 172 Ill. App.3d 712, 122 Ill.Dec. 557, 526 N.E.2d 950; *Cole v. Housing Authority of LaSalle County,* 68 Ill.App.3d 66, 24 Ill.Dec. 470, 385 N.E.2d 382 (3d Dist.1979). Neither is this a case in which a child or group of children were entrusted by their parents to an adult or organization in order to engage in supervised activities. *See Castro v. Chicago Park District,* 178 Ill. App.3d 348, 127 Ill.Dec. 632, 533 N.E.2d 504 (1st Dist.1988); *Crohn v. Congregation B'Nai Zion,* 22 Ill.App.3d 625, 317 N.E.2d 637 (3d Dist.1974); *Stanley v. Board of Ed.,* 9 Ill.App.3d 963, 293 N.E.2d 417 (1st Dist.1973); *Reid v. YMCA of Peoria,* 107 Ill.App.2d 170, 246 N.E.2d 20 (3d Dist.1969). Beth O'Clair was in the sole custody of and under the supervision of her mother, Debra O'Clair, at the time of the incident leading to her death.

**3.** Of course, a duty may exist where one has been voluntarily assumed. *See, Breeze v. Payne,* 181 Ill.App.3d 720, 130 Ill.Dec. 386, 537 N.E.2d 453 (5th Dist.1989); *Rahn v. Beurskens,* 66 Ill. App.2d 423, 213 N.E.2d 301 (4th Dist.1966). But, this doctrine has no applicability here.

**4.** At first glance, the instant case may fall readily into the pattern of analysis announced in *Kahn.* However, a closer examination reveals that it does not quite fit. Focusing on the child's ability to appreciate the risk, *Kahn* and its progeny are targeted at duties existing to unsupervised children, not those in the custody of their parents. *See Corcoran,* 22 Ill.Dec. at 703–04, 383 N.E.2d at 179–80 *(Kahn* is an exception to rule of no duty to those wrongfully or unexpectedly on land, reference in *Kahn* is to "unattended" children.) In any event, disagreement on this point is largely academic, since foreseeability must be gaged by what was known to defendants at the time of the incident, that Beth was under the supervision of her mother.

The parental duty of supervision has been cited by numerous reported decisions of the Illinois courts. Of these, five Illinois Appellate court decisions most clearly illustrate the interplay between the parent's duty of supervision and the element of foreseeability of harm to the child.

In *Mooney v. Etheridge*, 65 Ill.App.3d 847, 22 Ill.Dec. 436, 382 N.E.2d 826 (2d Dist.1978), an eight year old girl, on her way to ballet class, was struck and injured by an automobile immediately after her mother dropped her off on the other side of the street from the park district building in which the ballet lessons were held. Plaintiff sued the park district, arguing that it owed a duty to her to provide supervisory personnel or warning devices to assist the plaintiff in crossing the street. 22 Ill.Dec. at 240–41, 382 N.E.2d at 830–31. The *Mooney* court affirmed the trial court's conclusion that, as a matter of law, the park district owed no duty to plaintiff. There was a safe manner in which the child could have gained access to the building. As the *Mooney* court noted, "the plaintiff remained with her mother who could have acted in the same capacity as a crossing guard. 22 Ill.Dec. at 241, 382 N.E.2d at 831. Her mother also could have dropped her off on the same side of the street as the building. The decision to drop the child off in a manner which required her to cross the street "was a decision of plaintiff's mother who had the primary duty to protect the child." 22 Ill.Dec. at 240, 382 N.E.2d at 830 (*citing Driscoll*, 219 N.E.2d at 486).

*Kay v. Ludwick*, 87 Ill.App.2d 114, 230 N.E.2d 494 (4th Dist.1967), involved a four year old child and her mother who were guests at defendant's home. The defendant was mowing his lawn with a power riding mower. The child, although "under the apparent if not actual care, custody, control and management of her mother," 230 N.E.2d at 497, attempted to climb aboard the moving vehicle and came in contact with the moving mower blade which severed her left heel.

The *Kay* court found that no duty was owing by defendant. It observed that, as

"[t]he operation of this mower was either fully known to the parent or patently obvious to the parent, ... [i]t seems clear that this mother observed no apparent harm in permitting her child to play in the yard while the mower was in operation." *Id.* at 497–98. The *Kay* court then went on to hold that:

It seems to us, therefore, that neither the "likelihood of injury" such as this record discloses nor the existence of an "apparent risk" of such an injury is such as to mark the conduct of this defendant as unreasonable. To promulgate a standard of conduct which requires a host to discontinue a mowing of his yard in the presence of minor children or in the alternative to tie the child to a bedpost is to impose upon a host an unrealistic burden and duty where such child or children are under the apparent or actual control of a parent or parents.

.   .   .   .   .

*To say that there is more is to impose on a host a duty superior to the one the parent here owed to the child.* If the parent was exercising reasonable care for the safety of her child under the allegations of this complaint, it appears to us that a like result must be accorded to the host in the performance of her duty to the minor child. There was no breach by the defendant of any standard of conduct or duty that the law requires. (emphasis added).

*Id.* at 497–98.

Where an eleven month old child was burned when he fell from the bed in his mother's apartment onto an uninsulated steam pipe next to his bed, the trial court's grant of summary judgment in favor of the landlord was affirmed. *Trotter v. Chicago Housing Authority*, 163 Ill.App.3d 398, 114 Ill.Dec. 529, 516 N.E.2d 684 (1st Dist.1987). Also recognizing that the responsibility for a child's safety lies primarily with the parents, the *Trotter* court held that no duty existed because it was not reasonably foreseeable "that an 11–month–old infant, who was beginning to be active, would be left unattended on a bed without sides." 114 Ill.Dec. at 532, 516 N.E.2d at 687.

In *Keller*, a child was injured while playing floor hockey at his friend's house. Plaintiffs alleged that the parents of their child's friend owed a duty to either prohibit the children from playing or warn them to use protective equipment. 84 Ill.Dec. at 412, 472 N.E.2d at 162. The *Keller* court discussed the risk of injury, 84 Ill.Dec. at 413, 472 N.E.2d at 163, and observed that the injured child's parents saw the children playing floor hockey and neither prohibited them from doing so nor warned them to wear protective equipment. 84 Ill.Dec. at 414, 472 N.E.2d at 164. Citing both *Driscoll* and *Kay*, it emphasized the parent's duty to supervise. The court then concluded that no duty was owing:

> The burden sought to be imposed upon defendants is inordinately high, requiring constant surveillance of the boy's play activities.... The existence of such a legal obligation, if generally known, would lead persons in the position of defendant to prohibit the use of their property by friends of their children.
>
> .    .    .    .    .
>
> We will not impose a duty upon defendant to warn of dangers which were not regarded as such by ... [plaintiff's] ... parents.

84 Ill.Dec. at 413–14, 472 N.E.2d at 163–64.

Finally, in *Campbell v. Northern Signal Co.*, 103 Ill.App.3d 154, 58 Ill.Dec. 638, 430 N.E.2d 670 (5th Dist.1981), a child was burned while using gasoline on his grandmother's farm. The child's mother was on the farm and in the vicinity of the accident when it occurred. 58 Ill.Dec. at 641, 430 N.E.2d at 673. The *Campbell* court also found no duty to supervise owing by the grandmother. Rather, the court held that the presence of the mother in the vicinity of the accident when it occurred acted to reduce the level of conduct expected of the grandmother. *Id.*

Applying the above authorities, the court concludes that it was not reasonably foreseeable that Debra O'Clair, as Beth's mother, would fail to perform her parental duty to supervise Beth by taking any number of precautions, the most obvious of which was locking the sliding door, to safeguard her daughter from the risks posed to Beth by the pool. This was a risk which, though Beth, a three year old child, arguably could not appreciate,[5] her mother knew or should have known. Moreover, the harm resulting from the risk could have most easily and certainly been prevented by Debra O'Clair. Therefore, under Illinois law, no duty was owing from the Dumelles to Beth O'Clair.

This is not a case where the mother and her child arrive at a home which they had never visited, the mother is never told of the pool nor of its proximity to the house by the owners or occupiers of the premises, and, before the mother can learn of the pool and take appropriate precautions, the child enters the pool and drowns.

Debra O'Clair had visited the premises before with her daughter and their current stay there was an extended one. Debra O'Clair knew of the existence of the pool, of its proximity to the house, and of the deck connecting the house to the pool. She knew of her daughter's interest in the pool.[6] There is no indication that either of the Dumelles knew of Beth's interest in the pool. Most importantly, Debra O'Clair knew that Beth's access to the pool from the house could be gained or barred by a locking sliding door, which, if left unlocked, could be opened by Beth on her own. Under these circumstances, as they were known to the Dumelles, it was not reasonably foreseeable that the pool would present an obvious danger or hazard to Beth. This is because it was not foreseea-

---

**5.** However, in *Corcoran*, the Illinois Supreme Court held that the risk of falling into a water and trash filled ditch was something that a child old enough to be allowed at large (in that case a two year old) could recognize and appreciate. 22 Ill.Dec. at 704–05, 383 N.E.2d at 180–81. This case could have been decided on the same basis as *Corcoran*. However, having found that the reasonable foreseeability of Beth's access or unsupervised access to the pool was lacking, the court need not reach the issue of whether Beth could appreciate the risks posed by the pool.

**6.** Under *Kahn*, any "attraction" of Beth to the pool caused by any toys near the pool is merely another element in the foreseeability equation.

ble that Debra O'Clair would fail to lock the sliding door or to supervise Beth to an extent necessary to prevent her access to the pool.

Given that they knew that Debra O'Clair remained with Beth, the Dumelles had no duty to remain on the premises, on November 1, 1987, to supervise Beth, *see Campbell*, 58 Ill.Dec. at 641, 430 N.E.2d at 673, or to lock the sliding door when they left. As with the children in *Mooney* and *Kay*, Beth was in the custody of and under the supervision of her mother at the time of the incident. This is crucial in negating the reasonable foreseeability of the incident. As the parents in *Mooney* and *Kay* should have known of the hazards that traffic and a power mower, respectively, posed to their children and taken appropriate precautions, so should have Debra O'Clair. Just as it was not reasonably foreseeable in *Trotter* that an active eleven-month old child would be left alone on a bed without sides, it was not reasonably foreseeable that Beth, who could open an unlocked sliding door and gain access to the pool, would be allowed near the unlocked sliding door. *See also Alop*, 107 Ill.Dec. at 359, 507 N.E.2d at 23 (no duty as a matter of law where six year old was permitted by parent to play unsupervised on slide which posed an obvious risk to her).

On a more pleasant day, the Dumelles might have left the premises leaving the child and her mother together sitting by the side of the pool, expecting the mother to take reasonable measures to supervise and protect the child while enjoying an otherwise normal recreational activity. On the uncontroverted facts herein, the Dumelles left the premises leaving the child and her mother together sitting in the house behind closed but unlocked patio doors, expecting the mother to take reasonable measures to supervise and protect the child while enjoying normal child-mother activities. It is not the mere failure of Debra O'Clair to adequately supervise Beth or otherwise act to reduce a known risk to her, but the unforeseeability of her failure to do so, which prevents this court from imposing liability upon the Dumelles. A parent's failure to adequately supervise a child in order to eliminate or reduce a risk to the child may be foreseeable, where, for instance, the parent does not know of the risk or is unable to supervise the child. Had Debra O'Clair been bedridden at the time of the incident, it would not have been reasonable for the Dumelles to believe that she could adequately supervise Beth and they would have had a duty, under *Kahn*, to take reasonable precautions to ensure Beth's safety while she was on their premises. But, such was not the case here.

The duty plaintiff would have imposed upon defendants is inordinately high. Such a duty would be greater than that imposed upon parents and, as the *Kay* and *Keller* courts, respectively, concluded, would force a host to either restrain visiting children or prohibit children from visiting their premises.

With respect to the remaining conduct of defendant (all relating to the condition of the pool), which plaintiff alleges constituted a breach of duty, the court holds that this conduct was not a breach of duty. No duty existed. Under the circumstances of this case, the most important of which was that Beth was under the custody and supervision of her mother, it was not reasonably foreseeable that Beth would have access to the pool because it was not reasonably foreseeable that Debra O'Clair would fail to take the basic precaution of ensuring that Beth did not have access to the pool by locking the sliding door or by taking other protective measures. Nevertheless, plaintiff's allegations regarding the condition of the pool deserve some attention.

Concerning plaintiff's claim that there was a duty to "fence" in the pool, it is undisputed that there were no municipal ordinances governing private pools in existence at the time of the incident. Plaintiff has submitted an ordinance from a neighboring county as an example of the standard of care. However, even had that ordinance governed the fencing of the pool, it was not meant to address the type of risk encountered here and thus, if complied with, would not have prevented the incident. The ordinance submitted requires fencing either around the property or pool

area and is clearly not intended to prevent access to a pool through the pool owner's home by invited guests, but rather to prevent access by trespassers.

As for the other conditions of the pool,[7] they merely made Beth's drowning possible. Illustrative is *Dunaway*, which was an action against an owner of an oil well and the owner of the land upon which the well was located to recover for injuries sustained by child who was injured, while trespassing on the land, when one of his companion's dropped a firecracker into an oil storage tank causing it to explode. 122 Ill.Dec. at 559, 526 N.E.2d at 952. Affirming the trial court's dismissal of the complaint, the *Dunaway* court concluded that the defendant's failure to enclose and lock the storage tanks merely created a condition which made plaintiff's injuries possible. There, the proximate cause of plaintiff's injuries was the objectively unforeseeable actions of a third-party—the misconduct of his companion. 122 Ill.Dec. at 559–60, 526 N.E.2d at 952–53. Here Beth's drowning was not due to the condition of the pool, but the objectively unforeseeable failure of Debra O'Clair to lock the sliding door leading to the pool or to take other protective measures.

In concluding that it was not reasonably foreseeable that Debra O'Clair would fail to fulfill her parental duty of supervision, the court is not in any way implying a cause of action on behalf of Beth against her mother. This would be contrary to the Illinois doctrine of parental tort immunity. *See Lawber v. Doil*, 191 Ill.App.3d 323, 138 Ill.Dec. 585, 547 N.E.2d 752 (4th Dist.1989);

*Duensing v. Tripp*, 613 F.Supp. 766 (S.D. Ill.1985). Neither is the court imputing any "negligence" on the part of Debra O'Clair to Beth in order to defeat Beth's recovery. *See* Ill.Rev.Stat. Ch. 70, ¶ 2 (the "Illinois Wrongful Death Act").

Under the Illinois Wrongful Death Act, the contributory negligence of a next of kin does not bar recovery.[8] Yet, no recovery can occur until it is found that the defendant owed a duty to the deceased. Nothing in the Illinois Wrongful Death Act prevents the conduct of the next of kin from being considered in the foreseeability analysis and resulting in a finding that no duty was owing from the defendant to the decedent. This is not the functional equivalent of allowing next of kin "negligence" to bar recovery since there will be many times where a parent's failure to supervise the child to such an extent as to eliminate or minimize the risk from which the injury resulted will be foreseeable. *See generally Henry v. Robert Kettell Construction Corp.*, 82 Ill.App.2d 420, 226 N.E.2d 89, 96 (2d Dist.1967) (*proximate* contributory negligence of parents will bar recovery of child); *McClure v. Suter*, 63 Ill.App.3d 378, 20 Ill.Dec. 308, 379 N.E.2d 1376, 1382–83 (2d Dist.1978) (Nash, J., dissenting) (strongly criticizing *Henry*). Similarly, the prohibition of a cause of action on behalf of Beth against her mother for failure to supervise does not prevent the failure of a parent to exercise her primary duty of supervision over her child from being considered in the foreseeability inquiry.[9] This case is virtually indistinguishable from one in which, for instance, a young child falls down a staircase or wanders out an un-

---

7. See Note 6.

8. The contributorily negligent next of kin is simply prohibited from sharing in the reward. Thus, where the only next of kin is contributorily negligent, the administrator has no action on behalf of the next of kin. *See Lorts v. McDonald*, 17 Ill.App.2d 278, 149 N.E.2d 768 (4th Dist.1958).

9. Recognizing that the parental duty of supervision necessarily impacts upon the foreseeability of harm is consistent with parental liability for negligent control of children. *See, e.g., Basler v. Webb*, 188 Ill.App.3d 178, 135 Ill.Dec. 703, 544 N.E.2d 60 (5th Dist.1989). The parents' failure

to supervise or control their child not only may be the basis for a third party to establish liability of the parents for injuries to the third party as a result of the unsupervised child's conduct, where the foreseeability of the need for the parents to control or supervise the child and the ability of the parents to control or supervise the child creates a duty for the parents to do so; it should also prevent the parents from establishing the liability of a third party for injuries sustained by the child, where the unforeseeability of the parents' failure to supervise the child prevents the creation of a duty for the third party to take precautions to protect the child from injury.

locked door into traffic, while visiting a neighbor in the company of his parent. Under the circumstances of this case, where the young child was under the sole custody and supervision of a parent, it was not foreseeable that the parent would fail to undertake basic precautions to safeguard the child from an obvious risk which was well known to the parent.

Accordingly, defendants' motion for summary judgment is granted.

IT IS SO ORDERED.